**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CERTAINTEED CEILINGS CORP.,**<br>        **Plaintiff,**<br><br>        **v.**<br><br>**DANIEL F. AIKEN,**<br>        **Defendant.** | **CIVIL ACTION**<br><br><br><br>**NO. 14-3925** |

**MEMORANDUM RE: MOTION FOR PRELIMINARY INJUNCTION**

Baylson, J.                                           October  24, 2014

## I.    Introduction

Plaintiff CertainTeed Ceilings Corp. ("CertainTeed") seeks a preliminary injunction to enforce a non-compete and non-disclosure agreement against defendant Daniel Aiken ("Aiken"). Aiken was an architectural sales manager for CertainTeed, marketing CertainTeed's ceiling products to architects, distributors, contractors, and building owners in a mid-Atlantic sales territory designated A22S (roughly Richmond, Washington, D.C., Baltimore, and surrounding areas). Aiken resigned from CertainTeed at the end of April 2014 and shortly thereafter began working for Rockfon LLC ("Rockfon"), a competing ceiling products company, in a substantially similar sales role and in essentially the same territory. On June 25, 2014, CertainTeed moved for a preliminary injunction to prevent Aiken from working for Rockfon in his former sales territory for one year. Mot. for Prelim. Inj. (ECF 3). In an order dated October 9, 2014 (ECF 33), the Court granted CertainTeed's motion. This memorandum explains the Court's reasons for granting the preliminary injunction.

**II.**   **Findings of Fact**

   A.      The Factual Record Before the Court

The parties stipulated to expedited discovery, Stip. (ECF 5), and to submission of the factual record on paper and in video in lieu of live testimony at a preliminary injunction hearing, Stip. (ECF 16) and Stip. (ECF 17). The resulting factual record before the Court includes documents produced by CertainTeed, Aiken, and Rockfon, and deposition transcripts for defendant Daniel Aiken, and for Christopher Marshall ("Marshall"), Thomas Dorsey ("Dorsey"), and Graham Thayer ("Thayer"). See generally Exhibit Designations and Exhibits (ECF 18-21). Marshall was Rockfon's designated deponent under Federal Rule of Civil Procedure 30(b)(6); he is Rockfon's sales director for North America and Canada, and is Aiken's direct supervisor at Rockfon. Pl. Ex. A (Marshall Tr. 4:13-16, 7:10-20). Dorsey was designated as one of CertainTeed's Rule 30(b)(6) witnesses and also testified as a fact witness; he is CertainTeed's Regional Sales Manager and was Aiken's direct supervisor at CertainTeed at the time Aiken resigned. Pl. Ex. C (Dorsey Tr. 7:12-23, 18:25 – 19:6, 20:11-17). Thayer was also designated as one of CertainTeed's Rule 30(b)(6) witness; he is CertainTeed's Vice President and General Manager, and is the highest-ranking corporate officer of CertainTeed Ceilings, Inc. Pl. Ex. D (Thayer Tr. 9:4 – 10:4, 12:13-19).

In addition, Aiken cites to exhibits attached to his Memorandum in Opposition to CertainTeed's motion for preliminary injunction (ECF 8), which include a declaration of Aiken, Aiken Decl. I (ECF 8-3 at 46-47), and a declaration of John Medio, Rockfon's President, Americas & Far East, Medio Decl. (ECF 8-3 at 42-44). Aiken also attached a second declaration

to his response to CertainTeed's proposed findings of fact and conclusions of law, Aiken Decl. II (ECF 28-1).[1]

       B.     <u>Background on CertainTeed, Rockfon, and the Sale of Ceiling Systems</u>

       Rockfon and CertainTeed are competitors in the ceiling products market. Pl. Ex. B (Aiken Tr. 37:19-22). Both companies manufacture and sell ceiling systems throughout North America, including ceiling tiles and the grid suspension systems that hold the tiles in place. Medio Decl. ¶¶ 3-4 (ECF 8-3 at 42). Historically, Rockfon sold the grid suspension systems and CertainTeed sold the ceiling tiles, but both companies now sell the complete ceiling package. <u>Id.</u>; Pl. Ex. D (Thayer Tr. 85:8 – 86:6). Although their products do not overlap completely, Aiken estimates that about 60 percent of the products he sells for Rockfon have a competing product from CertainTeed. Pl. Ex. B (Aiken Tr. 96:3 – 99:1). The overall market for ceiling systems is dominated by two larger competitors: Armstrong World Industries, Inc. (with over 50 percent of the market) and USG Corporation (with about 32 to 33 percent of the market). Pl. Ex. D (Thayer Tr. 84:3 – 86:12); Medio Decl. ¶ 3 (ECF 8-3 at 42). CertainTeed is the third largest ceiling company, Rockfon is fourth, and the rest of the market is divided among five or six other companies. Pl. Ex. D (Thayer Tr. 84:3 – 85:7, 87:24 – 88:5).

---

[1] CertainTeed objected to consideration of these declarations because they were filed after the close of discovery and CertainTeed was unable to depose these witnesses regarding the facts averred in their declarations. <u>See</u> Response of Pl. CertainTeed to Proposed Findings of Fact and Conclusions of Law of Def. Aiken, at 1-2 (ECF 27); Objection of Pl. CertainTeed to Decl. of Def. Aiken (ECF 29). To the extent the declarations are material, the Court will consider them because similar testimony could have been introduced at an evidentiary hearing. In addition, at oral argument on October 9, 2014, counsel for CertainTeed stated that there are not any disputed material facts for purposes of CertainTeed's motion for preliminary injunction. Counsel for Aiken argued that there are disputed material facts. Accordingly, for the purposes of this memorandum the Court views any factual disputes in the light most favorable to Aiken but nonetheless finds that a preliminary injunction is justified.

The selling process for ceiling systems begins with marketing to architects, who specify one or more types of ceiling products in their building designs. Medio Decl. ¶ 5 (ECF 8-3 at 42-43). The architect's specifications are passed on to contractors who bid on the project and, if awarded the project, eventually buy the ceiling products from the manufacturer or a distributor. Id. ¶ 7. Building owners also see the specifications and have the final decision on what products are used. Id. ¶ 10. The selling process consists of persuading architects to specify a particular company's product and then convincing contractors, distributors, and building owners to keep the specification or, if a competitor's product was specified, to "flip the spec" to a product from the sales representative's company. Id. ¶¶ 5-10. Various details about ongoing or upcoming projects, which can include the text of the architect's specifications, are publicly available through subscription databases like McGraw Hill's Dodge system. Id. ¶ 13; Pl. Ex. C (Dorsey Tr. 34:12-22) (confirming that everyone in the industry has access to project specifications through Dodge or similar systems).

> C.    Aiken's Employment Agreement with CertainTeed

On May 12, 2010, prior to beginning his employment with CertainTeed, Aiken signed a "Noncompete Employee Agreement" ("Agreement"). Pl. Ex. A4. The Agreement contained both non-disclosure and non-compete covenants. The general non-disclosure provision specified that:

> I shall use my best efforts and diligence both during and after my Company employment to protect the confidential, trade secret, and/or proprietary nature of all Confidential Information.  I shall not directly or indirectly use (for myself or another) or disclose any Confidential Information for so long as it shall remain proprietary or protectable as confidential or trade secret information, except as may be necessary for the performance of my Company duties.

Id. at 1 ¶ 3. The Agreement defined "Confidential Information" to mean "all technical and business information of the Company, whether patentable or not, which is of a confidential, trade secret and/or proprietary nature and which is either developed by me

4

or to which I have had access during my employment." <u>Id.</u> at 1 ¶ 2. The Agreement also

provided that "all of my obligations set forth in the preceding paragraphs of this

Agreement shall continue beyond termination for any reason of my employment with the

Company, and that such obligations shall be binding on my heirs and assigns." <u>Id.</u> at 1

¶ 5.

> With respect to post-employment restrictions, the Agreement specified:
>
> I shall not, without written consent signed by an officer of the Company, directly or indirectly (whether as owner, partner, consultant, employee or otherwise), at any time during the one-year period following termination of my employment with the Company, engage in or contribute my knowledge to any work or activity that involves a product, process, apparatus, service or development (i) which is then competitive with or similar to a product, process, apparatus, service or development on which I worked or (ii) with respect to which I had access to Confidential Information while at the Company at any time during the period prior to such termination. The preceding sentence shall not apply if my employment is terminated by the Company without cause. The above one-year period shall not run during any period in which I am in violation of this paragraph.
>
> In the event of a breach by me of this covenant, and in recognition that any remedy at law for my breach or threatened breach would be difficult to measure and inadequate and that any such breach or threatened breach would cause such immediate and permanent damages as would be irreparable, the Company, in addition and as a supplement to such rights and remedies as may exist in its favor, may apply to any court of law or equity having jurisdiction to enforce the specific performance of this covenant, and/or may apply for injunctive relief against an act which would violate this covenant.

<u>Id.</u> at 2 ¶ 7. The Agreement's non-compete provisions do not contain any express

geographic limitations but there is a header on each page of the agreement that reads

"Policies and Procedures for North America." <u>Id.</u> at 1-3.

> D.      Aiken's Employment With CertainTeed and Departure for Rockfon

Aiken began working for CertainTeed on June 1, 2010 as an Architectural Sales

Associate. Pl. Ex. I. On December 16, 2011 he was promoted to Architectural Sales Manager,

Am. Compl. ¶ 14 (ECF 14), the position he held until his resignation in late April 2014, Pl. Ex. B

5

(Aiken Tr. 7:22 – 8:13). At CertainTeed, Aiken's sales territory (designated "A22S") included most of Maryland, West Virginia, Virginia, and the District of Columbia, including the cities of Baltimore, Washington, D.C., and Richmond. Pl. Ex. A7; Pl. Ex. C (Dorsey Tr. 22:9-17). In addition, from "[r]oughly 2010 to the beginning of 2012," Aiken's sales territory included "[a] little bit of South Carolina and all of North Carolina." Pl. Ex. B (Aiken Tr. 35:8-14).

CertainTeed's position questionnaire describes the responsibilities of an Architectural Sales Manager as "selling acoustical ceiling systems to distributors and contractors through focused education, demonstrations, and promotions to architects and other specifiers." Pl. Ex. A5. Specific duties include conducting "ceiling product and system presentations to architects and customers"; conducting "a minimum number of AIA [American Institute of Architects] presentations in the assigned territory"; "identify[ing] new customers through effective research including . . . directories, online tools, leads from existing clients, participation in organizations, and networking internally / externally"; "obtain[ing] current information from the marketplace regarding competitor's pricing, products, new products, delivery schedules, merchandising technique, etc."; and "maintain[ing] a database of architects, contractors and distributors for the assigned territory." Id.

Aiken spent about 20 percent of his time at CertainTeed on architects, the majority of which was conducting "lunch and learn" sessions.[2] Pl. Ex. B (Aiken Tr. 11:5-10). A "lunch and learn" is an American Institute of Architects (AIA) accredited presentation to an architectural firm "that is made up of 50 minutes of generic educational information followed by [a] five to

---

[2] CertainTeed's witnesses testified that Aiken was expected to spend at least 60 percent of his time meeting with architects and should have split his remaining time roughly equally among distributors, contractors, subcontractors, and building owners. Pl. Ex. C (Dorsey Tr. 161:10 – 163:3), Pl. Ex. D (Thayer Tr. 235:7-11). For purposes of this motion for preliminary injunction, the Court assumes that Aiken's testimony accurately described his activities for CertainTeed.

ten minute session of introducing yourself [and] who your company is." Id. 13:10-23, 195:19-24. Aiken spent about 40 to 50 percent of his time working with distributors, and his remaining time with contractors and representatives of building owners. Id. 11:23 – 13:9. Overall, Aiken was a "generalist" for CertainTeed, covering "each entity throughout the buying process." Id. 8:14-23.

Aiken was first contacted by Rockfon in mid-March 2014. See Pl. Exs. Y, BB. A few weeks later Aiken received a letter dated April 9, 2014 offering him a position with Rockfon as "Architectural Sales Manager for our Washington DC/Richmond/Baltimore market." Pl. Ex. A8. Aiken subsequently received an updated employment offer letter dated April 17, 2014, which added a paragraph stating that Rockfon's offer was based on "your individual attributes" and "we do not require, request or expect you to bring or otherwise disclose to us any confidential information belonging to CertainTeed." Pl. Ex. A9. When Aiken notified CertainTeed that he was leaving, Dorsey tried to persuade him not to resign and then informed him that CertainTeed intended to hold him to his non-compete agreement. Aiken Decl. I. ¶¶ 4-5 (ECF 8-3 at 46); Pl. Ex. B13 at AIKEN000066-69. Dorsey also told Aiken that CertainTeed would make an example of him because he was joining Rockfon, and likely would not seek to enforce his non-compete agreement if he were going to another competitor such as USG or Armstrong.[3] Aiken Decl. I ¶ 6 (ECF 8-3 at 46); Pl. Ex. A10. After Aiken reported Dorsey's statements to Rockfon, counsel for Rockfon and CertainTeed exchanged letters regarding Aiken's employment with Rockfon and his agreements with CertainTeed. Pl. Exs. A10, A11.

---

[3] Dorsey testified that he never told Aiken that the non-compete agreement would not be enforced if Aiken left for USG or Armstrong. Pl. Ex. C (Dorsey Tr. 174:14-25). Again, for purposes of this memorandum, the Court assumes that Aiken's testimony is accurate.

E.     Aiken's Employment with Rockfon

Aiken resigned from CertainTeed in late April 2014, and began working as an Architectural Sales Manager for Rockfon on May 5, 2014. Pl. Ex. B (Aiken Tr. 7:16 – 8:6). At Rockfon, Aiken's sales territory includes Maryland, Virginia, and Washington, D.C., especially the cities of Baltimore, Washington, and Richmond. Pl. Ex. B (Aiken Tr. 6:13 – 7:7). Rockfon's offer letters described Aiken's duties as "the sales, specification and tracking of Rockfon's acoustical ceiling tiles and Chicago Metallic grid systems and metal ceiling products to contractors, distributors, architectural specifiers, national accounts and end-users." Pl. Exs. A8, A9. Rockfon's position description states that an Architectural Sales Manager's duties include working "with architects and designers, building owners and property developers, contractors, and distributors to secure the specification and purchase of Rockfon acoustic ceilings and Chicago Metallic grid systems and metal ceilings"; "proactively assist[ing] our District Sales Managers to ensure sales and technical deliverables are met towards Contractors and Distributors"; and "monitor[ing] and report[ing] on key competitive, customer and industry activities through formal internal channels." Pl. Ex. A6.

At Rockfon, Aiken is "almost a hundred percent on the architectural side" and when contacted by a distributor he directs them "to our distributor and contractor sales representative in my market." Pl. Ex. B (Aiken Tr. 8:14 – 9:14). Aiken has nonetheless had various meetings and communications with distributors Allied, ProBuild, and Kamco, each of which he had previously visited for CertainTeed. Id. 22:15 – 23:4, 42:23 – 44:7, 120:18 – 122:20, 124:1 – 125:6, 130:5-20; Pl. Ex. B13 at AIKEN 000113-150 (email communications between Aiken, on behalf of Rockfon, and representatives of Kamco, Allied, and ProBuild).

With respect to his interactions with architects, Aiken agrees that his work for Rockfon is "precisely the same thing" that he did for CertainTeed. Pl. Ex. B (Aiken Tr. 88:6-11). Aiken also repeatedly identified architects and architecture firms that he formerly solicited for CertainTeed and now solicits for Rockfon. On behalf of Rockfon, Aiken has contacted at least three architects that he first met or developed a relationship with during the course of his work for CertainTeed. Id. 111:5 – 112:7 (Eliza Engle at Geier Brown Renfrow Architects), 114:4-22 (Amanda Hoch at ASHW Group), 127:19 – 128:15 (Jason Diaz at Shalom Baranes Associates), 133:20 – 134:14 (lunch and learn for Geier Brown Renfrow Architects). He has also contacted, for Rockfon, additional architects that he knew or knew of prior starting at CertainTeed and that he had previously contacted on behalf of CertainTeed. Id. 135:16 – 136:22 (HOK), 139:9-23 (BCWH). In addition, Aiken was scheduled to conduct a "lunch and learn" session with MTFA Architecture on behalf of CertainTeed on July 30, 2014. Pl. Ex. LLL. When asked how his new role at Rockfon would affect that session, Aiken responded that "You could contact CertainTeed to reschedule…it will probably be some time before they get a new person up and running. Or you could pencil me in for the attached CEU! Similar material on acoustics but product is different." Id. Aiken ultimately scheduled a Rockfon-oriented "lunch and learn" presentation with MTFA Architecture for October 22, 2014. Id.; Pl. Ex. KKK.

F.    CertainTeed Trained Aiken in Selling Ceiling Systems

As part of his sales training, Aiken learned CertainTeed's "strategy on how to position our products, which we [CertainTeed] don't share." Pl. Ex. D (Thayer Tr. 157:8-10). CertainTeed is focused on "environmental acoustics" with the objective of having "a sales force that is superior to our competitors in acoustical knowledge, and [] able to sell that to the architect." Id. 180:2-22. To that end, Aiken attended CertainTeed's Sound Academy where "[h]e

would have learned advanced acoustics, [and] how to sell an architect on acoustical concepts. Acoustics is very difficult to teach." Id. 157:15 – 158:2. Aiken also attended CertainTeed's Green Academy where he learned about educating architects on the environmental impact of CertainTeed's products using CertainTeed's Environmental Product Declarations. Id. 157:15 – 158:10. These CertainTeed trainings are proprietary. Id. 160:4-11. It takes CertainTeed six to twelve months to train a new ceiling products sales representative. Id. 301:1-2. Overall, Aiken "learned a great deal about our company [CertainTeed] and our abilities, our products, pricing strategy, so on an[d] so forth, that in a day-to-day market, . . . if even he didn't expound that directly to a customer or an architect, he would be able to, you know, use that and position his products against us on a daily basis." Pl. Ex. C (Dorsey Tr. 157:12-19).

G.    The Importance of Customer Relationships in CertainTeed's Business

Customer relationships are "extremely important" in a sales job. Pl. Ex. C (Dorsey Tr. 166:10-14). A customer "will not buy from you if they don't like you, if they don't trust in you. So it takes a long time to build that trust and equity with a customer. . . . It takes time and it takes doing business with them. And either doing business with them or just being visible to them over a long period of time." Id. 166:10 – 167:2 (interceding question omitted). In general, a good sales representative "would have very good relationships with architects. And the good ones are go-to people for that architect because they don't suffer fools lightly, so they're not going to waste their time with a poor rep." Pl. Ex. D (Thayer Tr. 83:16-22). Architects generally only want to deal with "really good reps" who "are viewed as a valuable source of information to the architects." Id. 231:1-6. If CertainTeed's representatives "become the source of information, then [CertainTeed has] a much better chance of getting [its] product specified. So [CertainTeed] get[s] to sort of [be] the ones that influence the decision of the architect more effectively." Id.

232:4-10. As Aiken himself testified, in meeting with architects "[y]ou want to build their confidence in the system" and the "end goal is to have your product specified." Pl. Ex. B (Aiken Tr. 14:3-22).

Aiken's relationships with architects are "very much" valuable to CertainTeed. Pl. Ex. C (Dorsey Tr. 173:11-14). Within his CertainTeed territory, Aiken has "the relationship with the architect, he has the knowledge of which architects sell products or have a particular bent toward our particular selling, if they're more environmentally oriented, if they're more acoustically-oriented, who are the ones that would more readily accept" CertainTeed's sales methods. Pl. Ex. D (Thayer Tr. 162:1-10).

As of the close of expedited discovery CertainTeed had not hired a replacement sales representative for Aiken's former territory and Dorsey was covering Aiken's former territory on an interim basis. Pl. Ex. C (Dorsey Tr. 20:15-17). In doing so, Dorsey was focused on communicating with distributors to maintain the business because "[t]here's just no time in the day" for him to focus on driving new business from architects. Id. 35:1 – 40:4. Dorsey has not proactively reached out to architects in the territory or followed up with architects who contacted him for information. Id. Contacting architects to drive new business is still "a high priority for the company" but it has been a low priority for Dorsey while trying to maintain the business without a sales representative in the region. Id. 38:17 – 39:9. Prematurely sending in an ill-equipped CertainTeed sales representative would "cause more damage, because of the relationship with the architect." Pl. Ex. D (Thayer Tr. 297:7-12).

H.      Aiken's Access to Confidential Information at CertainTeed

Aiken repeatedly testified that he was given access to CertainTeed confidential

information.[4] Pl. Ex. B (Aiken Tr. 80:14-17, 95:9-12, 184:2-6). For example, Aiken had access

to "SuperOffice," CertainTeed's password-protected, computerized customer relationship

management system. Id. 80:18 – 81:10; Pl. Ex. D (Thayer Tr. 262:3-17). The SuperOffice system

contains information collected by CertainTeed sales representatives such as personal information

about architects that "helps the sales process [and] helps you . . . better your relationship with

that firm." Pl. Ex. C (Dorsey Tr. 77:14-17, 79:19-21). It could also contain additional notes, such

as notations about key influencers who are "the individuals . . . that need to be sold, [and]

managed to either hold a specification or change a specification." Id. 65:18 – 66:24. SuperOffice

also gave Aiken access to gross sales information for customers in his territory. Pl. Ex. B (Aiken

Tr. 82:7-19). Aiken never downloaded or photocopied any information from SuperOffice. Id.

83:10-12.

I.      Implications of an Injunction for Aiken

Aiken assumes he will have to seek employment elsewhere if he is enjoined from

continuing to perform his current job. Pl. Ex. B (Aiken Tr. 62:17 – 63:3). However, he

acknowledged that the possibility of working for Rockfon in a different location has been

brought up at least once, id. 63:10-15, and that he would probably take such a job if it were

offered in lieu of not working for Rockfon, id. 64:5-14. He also agreed that he could cover the

---

[4] CertainTeed's witnesses testified that Aiken had access to confidential information about
CertainTeed products' pricing, performance, and special features. Aiken disputes this
characterization and argues that much of this information is not confidential, is outdated, or is no
longer accessible to Aiken. For the purposes of deciding CertainTeed's motion for preliminary
injunction, the Court disregards CertainTeed's disputed evidence about Aiken's exposure to
additional CertainTeed confidential information and relies only on the facts specifically found in
this memorandum.

Carolinas, and did so for CertainTeed, without moving from Richmond, although the Carolinas market is less robust than the Washington, D.C. market. Id. 69:3-15. Aiken further agreed that Rockfon has generally said that it will take care of him if an injunction is issued and that his manager and an HR representative both told him Rockfon would not let him end up without a job. Id. 102:4 – 103:3. Rockfon is paying Aiken's legal fees and expenses. Id. 61:17 – 62:16.

Rockfon currently has four other Architectural Sales Managers who are based in Boston, New York, Toronto, and Chicago. Id. 66:21 – 67:5; Pl. Ex. A (Marshall Tr. 92:22-25). These areas, along with Aiken's territory, represent the core markets that are Rockfon's focus for architectural sales. Pl. Ex. A (Marshall Tr. 93:6-11). Marshall, Rockfon's Rule 30(b)(6) deponent, testified that he did not know if Rockfon has plans to expand into additional areas and that he could "possibly" place Aiken into a different territory if Aiken were enjoined from working in the Richmond/Washington/Baltimore region. Id. 94:4-15.

## III.   Procedural History

CertainTeed filed a Verified Complaint on June 25, 2014 (ECF 1), and an Amended Verified Complaint on August 4, 2014 (ECF 14). The Amended Complaint contains six counts, alleging breach of contract, breach of fiduciary duty, and violations of the Uniform Trade Secrets Acts of Pennsylvania, Maryland, Virginia, and the District of Columbia. In an August 19, 2014 motion that is still pending before the Court, Aiken moved to dismiss Counts II through VI of the Amended Complaint related to breach of fiduciary duty and trade secret misappropriation (ECF 22).

CertainTeed moved for a preliminary injunction on June 25, 2014 (ECF 3). The parties stipulated to expedited discovery on July 2, 2014 (ECF 5). Aiken filed his opposition to the motion for preliminary injunction on July 29, 2014 (ECF 8). The parties further stipulated to

13

submit the record on paper and video, and to submit proposed findings of fact and conclusions of law in lieu of a live hearing (ECF 16). In accordance with the stipulation, the parties submitted exhibit designations and exhibits on August 13, 2014 (ECF 18-21). On August 22, 2014, the parties each submitted proposed findings of fact and conclusions of law (ECF 23, 24) and, on August 29, 2014, the parties submitted responses to each other's proposed findings and conclusions (ECF 27, 28). Subsequently, on September 3, 2014, CertainTeed filed objections to a declaration filed by Aiken (ECF 29), to which Aiken responded on September 5, 2014 (ECF 31). After reviewing the record and the parties' various filings, the Court heard oral argument on CertainTeed's motion on October 9, 2014. The Court entered an order granting a preliminary injunction and setting a pretrial schedule later that day (ECF 33).

## IV.     Conclusions of Law

### A.     Jurisdiction and Legal Standard for Granting Preliminary Injunction

The Court has jurisdiction over this diversity matter pursuant to 28 U.S.C. § 1332. As a diversity action, state law governs the substantive issues but "federal law governs the standards for issuing a preliminary injunction." Vector Sec., Inc. v. Stewart, 88 F. Supp. 2d 395, 399 (E.D. Pa. 2000) (citing Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989)).

A preliminary injunction is "an extraordinary remedy which should be granted only in limited circumstances." Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002) (quoting Instant Air Freight, 882 F.2d at 800). "In exercising its discretion, the District Court must be convinced that the following factors favor granting preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief;

(3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest." Id. The moving party has the burden "to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC., 428 F.3d 504, 508 (3d Cir. 2005).

      B.      CertainTeed Is Likely to Succeed on the Merits of Its Breach of Contract Claim

To assess whether CertainTeed has met its burden and established its right to a preliminary injunction, the Court begins by considering CertainTeed's claim for breach of contract. Because the Court concludes that CertainTeed has shown a likelihood of success on the merits of its breach of contract claim, the Court does not reach the parties' arguments regarding CertainTeed's claims for breach of fiduciary duty and misappropriation of trade secrets.

Restrictive covenants in Pennsylvania, including non-disclosure and non-competition covenants, "are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." Hess v. Gebhard & Co., 808 A.2d 912, 917 (Pa. 2002). In general, "mandating compliance with a covenant not to compete is disfavored." Victaulic Co. v. Tieman, 499 F.3d 227, 235 (3d Cir. 2007), as amended (Nov. 20, 2007). Pennsylvania law "permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer." Hess, 808 A.2d at 917 (quoting Sidco Paper Co. v. Aaron, 351 A.2d 250, 254 (Pa. 1976)). Aiken does not dispute that his non-compete and non-disclosure agreement was incident to his employment relationship with CertainTeed or that the one-year duration of

the non-compete provision is excessive.[5] Instead, he contends that the non-compete agreement is not necessary to protect to CertainTeed's legitimate interests and that it is not reasonably limited in geographic scope.

1.      CertainTeed Seeks to Protect Legitimate Business Interests

With respect to the Aiken's first argument, the Court concludes that CertainTeed has at least two legitimate business interests that it seeks to protect by enforcing Aiken's non-compete agreement: (1) its good will and customer relationships, and (2) the specialized sales training that it provided to Aiken. "To be reasonably necessary for the protection of the employer, a covenant must be tailored to protect legitimate interests. Generally, interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills. Similarly, not allowing competitors to profit from an employee's specialized training and skills is a legitimate use of a covenant." Victaulic, 499 F.3d at 235 (citations and internal quotation marks omitted). The good will entitled to protection is "that which 'represents a preexisting relationship arising from a continuous course of business.'" Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 424 (3d Cir. 2010) (quoting Butler v. Butler, 663 A.2d 148, 152 n. 9 (Pa. 1995)). Restrictive covenants "have developed into important business tools to allow employers to prevent their employees and agents from learning their trade secrets, befriending their customers and then moving into competition with them." Hess, 808 A.2d at 918 (internal quotation marks omitted).

Under Pennsylvania law, there is a well-established history of allowing companies to use restrictive covenants to protect customer relationships that are cultivated in the field by sales representatives. In Boldt Machinery & Tools, Inc. v. Wallace, the Pennsylvania Supreme Court

---

[5] "Pennsylvania courts routinely uphold one year restrictive covenants." Nat'l Business Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998).

held that the plaintiff machinery company had a protectable interest in the customer relationships developed by a salesman based on factual findings that the salesman "regularly had direct, personal contact with [the company's] customers at the customers' places of business, that this contact was an important element in making sales of machinery, and that [the salesman's] calls on the trade constituted the only contact between [the company] and many, although not all, of its customers in [the salesman's] sales territory." 366 A.2d 902, 906 (1976) (per curiam). Similarly, in Sidco Paper, the Pennsylvania Supreme Court held that the plaintiff paper company had a protectable interest in the customer good will cultivated by a regional salesman who had left to work the same region for a competitor. 351 A.2d at 253.

Like the plaintiffs in Boldt Machinery and Sidco Paper, CertainTeed is entitled to use a restrictive covenant to protect customer relationships that Aiken developed for CertainTeed's benefit. As described in the Court's findings of fact, testimony from Aiken, Dorsey, and Thayer established that relationships with architects, fostered by CertainTeed's sales representatives, are an important part of how CertainTeed sells its ceiling products. Moreover, Aiken has identified a number of specific examples of architects that he previously solicited for CertainTeed and now solicits for Rockfon. Pl. Ex. B (Aiken Tr. 111:5 – 112:7, 114:4-22, 127:19 – 128:15, 133:20 – 134:14, 135:16 – 136:22, 139:9-23). Given the evidence that CertainTeed's relationships with architects are important to its business and that Aiken is now actively seeking to sway some of those same architects to favor Rockfon products, the Court concludes that CertainTeed has a legitimate business interest in preventing its customer relationships and good will from being co-opted for Rockfon's benefit.

Pennsylvania law also allows employers to use restrictive covenants to protect "specialized training that would benefit competitors." Zambelli Fireworks, 592 F.3d at 424. For

example, in <u>Zambelli Fireworks</u>, the defendant had learned "unique skills that are very specific

to the pyrotechnic industry" through personalized training on layout and choreography for

fireworks shows, first-hand experience, and specialized training that allowed the defendant to

become a certified trainer himself. <u>Id.</u> at 424-25. Here, CertainTeed has shown that Aiken

learned unique skills that are specific to the ceiling products industry through proprietary

trainings on how to sell architects on acoustical concepts and how to sell based on the

environmental impact of CertainTeed products. Pl. Ex. D (Thayer Tr. 157:2 – 158:10, 160:4-11).

CertainTeed also established that it takes up to a year to train a new ceiling products sales

representative. <u>Id.</u> 301:1-2. The Court therefore concludes that CertainTeed's desire to prevent

Rockfon from immediately profiting from Aiken's "specialized training and skills is a legitimate

use of a covenant." <u>Victaulic</u>, 499 F.3d at 235 (internal quotation marks omitted).[6]

       Aiken argues that CertainTeed's interest in enforcing his non-compete agreement is anti-

competitive and improper, but his contentions overstretch the testimony from CertainTeed's

witnesses and overlook the legitimate business interests discussed above. It is undisputed that

"an employer may not enforce a post-employment restriction on a former employee simply to

eliminate competition *per se*; the employer must establish a legitimate business interest to be

protected." <u>Hess</u>, 808 A.2d at 918. In arguing that CertainTeed's goal here is to eliminate

competition, Aiken points to testimony from Thayer and Dorsey stating that CertainTeed seeks

to protect its business, make a statement to Rockfon, and prevent a competitor from poaching its

sales representatives. For example, Thayer testified that he is "seeking to protect [CertainTeed's]

---

[6] The Court is aware of, but finds inapposite, the Pennsylvania cases holding that "a worker's
aptitude, skill, dexterity, or his manual or mental ability" and "subjective knowledge [that] he
obtains in the course of his employment" are not protectable as trade secrets. <u>Iron Age Corp. v.
Dvorak</u>, 880 A.2d 657, 663 (Pa. Super. Ct. 2005). The issue here is not whether Aiken's skills or
training are a trade secret; the issue is whether CertainTeed has a legitimate business interest to
protect by enforcing a non-compete agreement.

business against an aggressive new competitor in the market that's been aggressively pursuing

our sales people . . . . [I]t's common knowledge that they're targeting us in particular and I want

to make sure we're able to defend ourselves against that." Pl. Ex. D (Thayer Tr. 115:10-18).

Similarly, Dorsey testified that CertainTeed management was "fearful that Rockfon, if they were

successful in -- in poaching one of our best players, that  . . . it would be a free-for-all. . . .

[T]here needed to be a statement made, not against Dan [Aiken], primarily against Rockfon, that

we were fearful that . . . it would be open season for our best people." Pl. Ex. C (Dorsey Tr.

143:11-19). Contrary to Aiken's arguments, these statements are consistent with the legitimate

business interests that CertainTeed may seek to protect under Pennsylvania law. As CertainTeed

has done here, employers are permitted to use restrictive covenants to prevent a competitor from

"profit[ing] from an employee's specialized training and skills," Victaulic, 499 F.3d at 235

(internal quotation marks omitted), and to prevent an employee from "befriending their

customers and then moving into competition with them." Hess, 808 A.2d at 918 (internal

quotation marks omitted).

> 2.  The Geographic Scope of the Covenant Is Reasonable When Limited to
>     Aiken's Former Sales Territory

With respect to Aiken's second argument, the Court concludes that the geographic scope

of his non-compete agreement is reasonable when it is limited to his former sales territory for

CertainTeed. Applying Pennsylvania law, courts "have found broad geographic restrictions

reasonable so long as they are roughly consonant with the scope of the employee's duties."

Victaulic, 499 F.3d at 237. However, for cases involving sales representatives with a defined

territory, "[a]n employer's interest in the customer relationships developed by an employee

whose contact with customers occurred at the customer's premises extends no farther than the

sales territory to which the employee was assigned. Thus, a restrictive covenant designed to

protect this interest is valid only insofar as it is limited to that area." <u>Boldt Mach.</u>, 366 A.2d at 908 (citations omitted). An overbroad covenant may be enforced "but only to the extent of the employee's sales territory." <u>Id.</u>

Aiken argues that his non-compete agreement has no geographic scope, which makes it gratuitously overbroad and "indicates an intent to oppress the employee and/or to foster a monopoly, either of which is an illegitimate purpose." <u>Sidco Paper</u>, 351 A.2d at 257. Therefore, Aiken proposes that the Court should not enforce the agreement at all. Def. Aiken's Proposed Findings, at 26-28 (ECF 24). As a factual matter, the agreement contains a header on each page that reads "Policies and Procedures for North America." Pl. Ex. A4 at 1-3. Aiken contends that the header indicates only that the agreement is meant to be given to employees in North America and that the non-compete provisions have no express geographic limits. Def. Aiken's Proposed Findings, at 27 (ECF 24); Def. Aiken's Response to Pl. CertainTeed's Proposed Findings, at 21 (ECF 28). CertainTeed contends that the header provides for a North America geographic scope for the non-compete covenant but, in its proposed conclusions of law, CertainTeed seeks to enforce the agreement only within Aiken's former sales territory "A22S." Proposed Findings of Pl. CertainTeed, at 4-5, 65 (ECF 23).

Under either interpretation, the Court concludes that enforcing the non-compete covenant within Aiken's former sales territory is a reasonable restriction on Aiken. The Pennsylvania Supreme Court has "repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions that are reasonably necessary for the protection of the employer." <u>Hess</u>, 808 A.2d at 920. To the extent CertainTeed seeks to protect the customer relationships that Aiken cultivated, its interest "extends no farther than the sales territory to which the employee was assigned." <u>Boldt Mach.</u>, 366 A.2d at 908. But to the extent that

CertainTeed seeks to protect its investments in Aiken's specialized skills and training, it may be entitled to a North America-wide injunction. It is undisputed that CertainTeed and Rockfon compete throughout North America, Medio Decl. ¶¶ 3-4 (ECF 8-3 at 42), and there is no obvious reason why Aiken's specialized training and skills would not benefit Rockfon anywhere that it competes with CertainTeed. However, Thayer testified that CertainTeed's "primary harm . . . is lost business and continued business as [Aiken] carries on relationships with the architects that he brought with him that he developed under our employment." Pl. Ex. D (Thayer Tr. 192:22 – 193:3). Given that these customer relationships were developed within Aiken's former sales territory, the Court concludes that the most appropriate way to protect CertainTeed's legitimate interests without unduly restricting Aiken's employment options is to enforce the non-compete agreement only within Aiken's former CertainTeed sales territory "A22S."

The cases that Aiken cites in support of his position that his non-compete should be declared void on its face for lack of geographic limits do not help him. See Def. Aiken's Proposed Findings, at 26-28 (ECF 24). His primary support, a non-precedential Third Circuit decision, acknowledged that "[w]hen a covenant imposes restrictions broader than necessary to protect the employer, a court of equity may 'blue pencil' the agreement by granting enforcement that is limited to those portions of the restrictions which are reasonably necessary for the protection of the employer." PharMethod, Inc. v. Caserta, 382 F. App'x 214, 220 (3d Cir. 2010). Moreover, the cited discussion in PharMethod was described therein as guidance to the district court on remand and was not part of the Third Circuit's holding. Id. at 218. The other cases that Aiken cites are similarly unhelpful to his position. In Quaker Chemical Corp. v. Varga, the court enforced a non-compete covenant that lacked a geographic limitation because the business at issue was worldwide. 509 F. Supp. 2d 469, 476-77 (E.D. Pa. 2007). In Sidco Paper, the

Pennsylvania Supreme Court affirmed a preliminary injunction that enforced a non-compete agreement within a paper salesman's former sales territory. 351 A.2d at 252, 254-57. And in Capsicum Group, LLC. v. Rosenthal, the court concluded that the plaintiff employer had a protectable interest only in customer good will, not in the defendant employees' unique or special skills, but nonetheless entered an injunction to restrain the former employees from interacting with the plaintiff's current and former customers. No. 13-cv-5322, 2013 WL 6667822, at *7-12 (E.D. Pa. Dec. 17, 2013). None of these cases is precisely analogous to the facts here and none held that a non-compete agreement was completely unenforceable for lack of a geographic restriction.[7]

* * * * *

Based on the foregoing discussion, the Court concludes that Aiken's non-compete agreement is enforceable within his former sales territory and further concludes that CertainTeed has shown that it is likely to succeed on the merits of its breach of contract claim. CertainTeed has thus met its burden with respect to the first of the four preliminary injunction factors, so the Court will not address at this time whether CertainTeed has shown a likelihood of success on the merits of its claims for breach of fiduciary duty and misappropriation of trade secrets.

---

[7] When Pennsylvania courts have found covenants unenforceable for geographic overbreadth, the facts have been more egregious than the facts here. For example, in Reading Aviation Service, Inc. v. Bertolet, a non-compete agreement was void on its face because it was "unlimited both in time and space," the employer's business was limited to three small airports, such broad restrictions imposed "an unconscionable burden on [defendant's] ability to pursue his chosen occupation," and the restrictions were "far greater than are reasonably necessary for the protection" of the employer. 311 A.2d 628, 629-30 (Pa. 1973). Reading Aviation was explicitly distinguished by the Pennsylvania Supreme Court when it upheld a preliminary injunction to enforce a paper salesman's non-compete agreement in Sidco Paper. 351 A.2d at 256-57. The Court concludes the facts here are more analogous to Sidco Paper than to Reading Aviation.

22

C.   CertainTeed Will Suffer Irreparable Harm Absent a Preliminary Injunction

CertainTeed has also shown that it will suffer irreparable harm if a preliminary injunction is not entered. Under Pennsylvania law, the harm from "unwarranted interference with customer relationships" is "unascertainable and not capable of being fully compensated by money damages." John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1167 (Pa. 1977). For this reason, when a restrictive covenant is reasonable "it is prima facie enforceable in equity." Id. The facts show that Aiken has interacted, on behalf of Rockfon, with architects that he previously solicited for CertainTeed. Pl. Ex. B (Aiken Tr. 111:5 – 112:7, 114:4-22, 127:19 – 128:15, 133:20 – 134:14, 135:16 – 136:22, 139:9-23); Pl. Exs. LLL, KKK. This interference with CertainTeed's customer relationships constitutes irreparable harm to CertainTeed. In addition, Aiken agreed in his non-compete agreement that a breach of the agreement would constitute irreparable harm and entitle CertainTeed to injunctive relief. Pl. Ex. A4 at 2 ¶ 7. While not dispositive, such a provision "generally weighs in favor of a finding of irreparable harm by courts within this District." Radian Guar. Inc. v. Bolen, No. 13-cv-6197, 2014 WL 2777450 at *9, 11 (E.D. Pa. June 19, 2014) (collecting cases and finding irreparable harm to the employer based in part on the stipulation to irreparable harm that the defendant employee had agreed to).

In his proposed conclusions of law, Aiken contends that CertainTeed has not established that it has suffered actual harm and that it waited too long to move for a preliminary injunction. Def. Aiken's Proposed Findings, at 32-34 (ECF 24). Aiken is correct that the fact that he took a job with Rockfon, on its own, does not irreparably harm CertainTeed. See Harsco Corp. v. Klein, 576 A.2d 1118, 1121 (Pa. Super. Ct. 1990) (finding no irreparable harm from violation of a non-compete agreement when a national sales manager took a job with a competing scaffolding company). But in Harsco the defendant "was not at that time dealing directly with customers,"

id., whereas Aiken was the face of CertainTeed for architects within his territory and he admits that he is now contacting some of those same architects for Rockfon. It is Aiken's solicitation of CertainTeed's customers and interference with CertainTeed's good will and customer relationships that constitutes irreparable harm. As for CertainTeed's delay in moving for a preliminary injunction, there is some evidence of negotiations between counsel for CertainTeed and Aiken that preceded the filing of CertainTeed's complaint and motion for preliminary injunction on June 25, 2014. Pl. Exs. A10, A11 (letters between counsel regarding Aiken's employment with Rockfon). The Third Circuit has held that a delay in seeking a preliminary injunction of fifteen months, "attributable to negotiations between the parties," did not disprove irreparable harm. Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC, 212 F.3d 157, 169 (3d Cir. 2000). Given that CertainTeed's minor delay in filing suit appears to have been attributable to negotiations between the parties, the Court concludes that the timing of CertainTeed's motion for a preliminary injunction does not prove a lack of irreparable harm.

In sum, the Court concludes that CertainTeed has satisfied its burden of showing that it will suffer irreparable harm absent a preliminary injunction.

D.    The Harm to Aiken from a Preliminary Injunction Does Not Outweigh the Harm to CertainTeed

As for possible irreparable harm to Aiken, there is evidence suggesting that Aiken may be harmed only minimally by an injunction. Rockfon is covering Aiken's legal costs, Rockfon representatives have told Aiken that Rockfon will take care of him if an injunction is issued, and Rockfon could offer Aiken a sales job in a different geographic region without displacing existing Rockfon personnel. Pl. Ex. B (Aiken Tr. 62:3 – 64:14, 69:3-15, 102:4 – 103:3); Pl. Ex. A (Marshall Tr. 92:22-25, 94:4-15). These facts weigh against Aiken in a balancing of the equities. See Radian Guar., 2014 WL 2777450 at *8-9 (finding that the equities favored granting

24

an injunction in part because the defendant employee's new company was paying her legal fees and had indicated it would support her financially if an injunction was issued).

Even if the Court assumes that Aiken will be unemployed, the potential harm to Aiken from granting an injunction does not outweigh the harm to CertainTeed from withholding relief. Courts applying Pennsylvania law have repeatedly concluded that "regardless of the relative wealth of the employer and employee, the harm to the employer trumps the harm to the employee" when a non-compete agreement is violated. <u>Quaker Chem.</u>, 509 F. Supp. 2d at 480 (collecting cases). Furthermore, Aiken knew about his non-compete agreement, was warned that CertainTeed would seek to enforce it, and chose to accept a job with Rockfon anyway. To the extent that any harm to Aiken is self-inflicted, that factor weighs against Aiken in a balancing of the equities. <u>Id.</u> at 480-81 (concluding that defendant brought harm from preliminary injunction on himself).

Accordingly, the Court concludes that the irreparable harm, if any, to Aiken from an injunction does not outweigh the irreparable harm that CertainTeed will suffer without an injunction. The Court thus concludes that CertainTeed has met its burden of showing that this factor favors preliminary injunctive relief.

      E.    <u>The Public Interest Favors Upholding Freely Contracted Obligations</u>

As for the final factor, the Court concludes that entering a preliminary injunction in this case is in the public interest. Upholding and enforcing a non-compete agreement can "serve the public interest by discouraging unfair competition, the misappropriation and wrongful use of confidential information and trade secrets, and the disavowal of freely contracted obligations." <u>Radian Guar. Inc.</u>, 2014 WL 2777450 at *11 (internal quotation marks omitted). Although "there is a public interest in employers being free to hire whom they please and in employees being free

to work for whom they please," <u>Bimbo Bakeries USA, Inc. v. Botticella</u>, 613 F.3d 102, 119 (3rd Cir. 2010), it is also "generally in the public interest to uphold an agreement freely entered into by the parties," <u>Vector Sec.</u>, 88 F. Supp. 2d at 401. Given the specific facts here, the Court concludes that it is in the public interest to allow CertainTeed to enforce a freely contracted obligation in order to protect its legitimate business interests.

## VI.    Conclusion

For the foregoing reasons, the Court concludes that CertainTeed has shown a likelihood of success on the merits of its claim for breach of contract and has shown that the other three preliminary injunction factors favor granting an injunction. Therefore, following oral argument on October 9, 2014, the Court entered a preliminary injunction (ECF 33) that:

(1) enjoined Aiken from employment with, or from providing services either directly or indirectly to, Rockfon or any of its affiliates, parents, subsidiaries, or employees for a period of one (1) year from October 13, 2014, in area A22S;

(2) enjoined Aiken from misappropriating, using, and/or disclosing CertainTeed's Confidential Information or Trade Secrets;

(3) enjoined Aiken from seeking or accepting employment with, or from providing services either directly or indirectly to, any other person or entity that is engaged in the same or similar lines of business as CertainTeed in the geographical area described by the parties as A22S; and

(4) required CertainTeed to post a bond in the amount of $25,000 without prejudice to defendant seeking a higher bond on evidence of undue prejudice.

/s/ Michael M. Baylson  10/24/14<br>Michael M. Baylson, U.S.D.J.

O:\CIVIL 14\14-3925 certainteed v. aiken\Memorandum of Law re Preliminary Injunction - 2014-10-22.docx